HELEN WILLIAMS v. CASS-CROW WING COOPERATIVE
ASSOCIATION.
SHELBY MUTUAL PLATE GLASS & CASUALTY COMPANY,
GARNISHEE.[1]

July 3, 1947.

No. 34,375.

[1]Reported in 28 N. W. (2d) 646.

*G. P. Mahoney* and *John S. Morrison,* for appellant.
*Ryan, Ryan & Ryan,* for respondent.

JULIUS J. OLSON, JUSTICE.

In our statement of facts we shall refer to the parties as they were named in the court below, *i. e.,* plaintiff, defendant, and garnishee. We find the facts to be substantially as follows:

The garnishee is a foreign corporation duly authorized to transact business in this state. It writes policies of public liability insurance and thereby agrees to pay, for an adequate consideration, on behalf of the insured and within prescribed limits, such sums as the insured may be required to pay to third persons for liability imposed by law upon the insured for bodily injuries and property damage sustained as a result of accidents proximately caused by the insured's negligence in the conduct of his business. Under the policy presently involved, the insurer was also obligated to investigate and defend, at its own expense, all claims arising thereunder. During the times here involved, the policy issued by the garnishee to defendant was in full force and effect.

Defendant is a Minnesota coöperative association, having for its business the purchase and the sale to its patrons of petroleum products, fuel, fertilizer, and other articles of merchandise. It operated a bulk station at Brainerd, Minnesota, and also owned retail filling stations at Pequot Lakes and Pillager. The station at Pequot

Lakes is the one here involved. That station was leased to one Sigville Anderson on a monthly rental basis, and he operated it as his own private enterprise, but he made most of his purchases of petroleum products from defendant on a wholesale basis. He also purchased such products from other dealers.

On March 14, 1945, plaintiff was seriously injured by a fire which destroyed the farm home in which she, her husband, and three children resided near Pequot Lakes. She and her family lived some ten miles beyond Pequot Lakes, approximately 25 miles from Brainerd, so that her home was at least 35 miles from Brainerd. The explosion which destroyed plaintiff's home and injured her was caused by what she supposed was pure kerosene. It was supposed to have been purchased at defendant's station at Pequot. On June 27, 1945, plaintiff brought this action to recover damages for personal injuries against defendant. Plaintiff prevailed and recovered a judgment against defendant for $10,000 on January 12, 1946. On January 15, 1946, plaintiff instituted the present proceeding against the garnishee, having been authorized to do so by an order of the court. This took place after the garnishee had appeared in the garnishment proceeding and denied all liability on its part to defendant. In this proceeding, a supplemental complaint was duly served. The garnishee answered, and plaintiff replied.

On plaintiff's motion in the court below and over the garnishee's objection, the court submitted this question to the jury:

"Did the defendant, Cass-Crow Wing Cooperative Assn., a corporation, give notice of the happening of the accident involved in this case to the garnishee [Shelby Mutual Plate Glass & Casualty Company, a corporation] as soon as practicable?"

The jury answered this in the affirmative. The court instructed the jury:

"* * * If you are satisfied by a fair preponderance of the evidence that the Cass-Crow Wing Cooperative Association did give notice to the insurance company of the happening of the accident herein involved as soon as practicable, that is, as soon as reasonable,

under the facts and circumstances disclosed by the evidence, then you should answer the question 'yes.' * * * If you are not satisfied by a fair preponderance of the evidence that the Cass-Crow Wing Cooperative Association did give notice to the insurance company of the happening of this accident as soon as practicable, that is, as soon as reasonable under the facts and circumstances herein disclosed, then you should answer the question 'no.' "

The garnishee excepted "to the court submitting the issue to the jury (1) on the ground that the court should have held as a matter of law that notice was not given as soon as practicable; (2) that the court should instruct the jury to answer the question 'no' as a matter of law."

The important and, we think, decisive question here is whether the giving of notice to the garnishee presented a fact question. If it did, liability should follow.

Except for the question submitted to the jury, the case was tried to the court, which did "specifically adopt the verdict of the jury" and did "specifically find that the notice of the said accident was given by the defendant to the garnishee as soon as practicable after the accident to plaintiff and that the defendant did not breach the terms of the policy with respect to the giving of notice of the accident."

The summons and complaint in the main action were served upon L. E. Glanville, defendant's local manager at Brainerd, on June 27, 1945. Being uncertain as to what procedure should be taken, he called up the president of defendant, who came to Brainerd the following day. Pursuant to his instructions, Glanville telephoned garnishee's St. Paul agency as to what should be done with the papers thus handed him. He testified that in the conversation then had, the garnishee's representative told him:

"Mail the summons down here to us and we will take care of it, and go ahead about your business and don't worry. We are the official worriers."

Glanville first learned of the Pequot Lakes accident when he read of it in a Brainerd paper shortly after it happened. He next heard of it on March 19, when the state oil inspector called on him at the bulk station. He was told by the inspector that the kerosene "that was supposed to have caused this fire up at Pequot was supposed to have been purchased from our station at Pequot." He attempted to communicate with Anderson's station at Pequot, but, not being able to get Anderson, talked to Mrs. Anderson, who said she did not know of any record of this sale of kerosene to plaintiff. The inspector, however, found that gasoline and kerosene had been mixed at the bulk plant in Brainerd because of a faulty distributing system, and he so advised Glanville. Defendant's tanks at Brainerd, Pequot, and Pillager were officially sealed by the inspector that day. From that time on, no one representing or claiming to represent plaintiff made any claim against defendant, nor was any information brought to any of defendant's officers that any such claim was thought of until the summons and complaint were served on June 27. At the time of the state inspector's visit, which occurred some five days after the fire, the garnishee thinks that defendant had acquired sufficient information about it to realize fully that trouble might ensue and that duty demanded that defendant give the garnishee the notice required under the terms of the policy. As a matter of fact, however, the inspector did not know that the kerosene purchased at Pequot Lakes had come from the Brainerd station. His examination was based solely upon the mixture of gasoline with kerosene purchased at the Anderson station.

Plaintiff, in her brief, recites the fact that this accident happened some 40 miles from Brainerd and that Mr. Glanville, defendant's manager at Brainerd, on learning from the Brainerd paper of the accident, got nothing in the way of information indicating that the Brainerd station was in any way involved or was likely to be blamed for the fire at Pequot Lakes. He testified that during this period there were reports of two other fires, one in Brainerd and one at Motley, 25 miles away. As to each of these accidents, no knowledge or information was given to defendant that it was

charged with liability for negligence or that it was otherwise the cause of plaintiff's harm.

Some three or four days after the summons and complaint had been mailed to and received by the garnishee, it sent its representative, Lynn Carroll, an investigator, to Brainerd. He interviewed Glanville regarding the entire matter. They made a trip to the hospital to visit Carl Wright, the state oil inspector. Carroll took a written statement from Glanville while there, a stay extending over "parts of two days." He and Glanville went over the bulk station, where the piping system was shown to Carroll. Carroll was given the valve which was suspected of being defective, and he has since retained it. The valve was given to him for the purpose of having it tested. His testimony in that regard is as follows:

"Q. And you told Mr. Glanville you wanted to have it tested?

"A. Yes.

"Q. Did you have it tested?

"A. No.

"Q. Where is the valve?

"A. I forgot about it until I heard it in court today. However, I had it. It must be in the trunk of my car.

"Q. So you still have it?

"A. I still have it."

After returning to his office in St. Paul, Carroll went back to Brainerd a few days later and again interviewed Glanville concerning this affair. This was on July 10. He obtained Glanville's signature to a so-called nonwaiver agreement. Glanville's testimony on that phase was as follows:

"Q. Now, will you tell the jury what Mr. Carroll told you about this nonwaiver agreement, defendant's exhibit 12, before you signed it?

"A. Well, he came up and said he had to have some more information in regard to notifying the company, and that is when he drew off the statement. Then later he came back and said there was a form the insurance company required, a nonwaiver agreement.

I wanted to know what it was. He wanted to know if I wanted to read it. I read it over. He said it was just another requirement of the insurance company.

"Q. Did you understand what that nonwaiver agreement was when you signed it?

"A. No, I did not."

On July 12, the garnishee answered the complaint in defendant's behalf, and not until August 13 were the pleadings sent to defendant with a curt statement that the garnishee refused to undertake the defense of the case. Subsequently, other counsel were retained by defendant. The result has already been stated.

The policy contains the following provision, upon which the garnishee heavily relies and which, in our view, presents the only question in this litigation:

"Notice of Accident-Claim or Suit. Upon the occurrence of an accident written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

The trial court found:

"That the garnishee retained the summons and complaint for an unreasonable length of time before returning them to the defendant, and by so retaining them and by answering in said action the garnishee waived any right it might then have had to take advantage of any delay in giving notice of the accident."

In addition:

"That any delay on the part of the defendant in giving notice of the accident to the garnishee did not prejudice the garnishee in any degree, since all possible information and all the facts surrounding

the accident and the injuries to plaintiff were just as available to the garnishee at and after the time it received notice as at and immediately after the happening of the accident."

As conclusions of law, the court directed judgment for plaintiff against the garnishee in the amount of the policy coverage, $10,000.

After these findings had been made and filed, the garnishee moved in the alternative for amended findings or a new trial. The garnishee appealed from the order denying that motion. We shall consider and determine only the issues presented on the motion for new trial, and these in the light most favorable to the findings.

The policy was written in the language chosen by the insurer. There is no requirement that notice must be given immediately or within any definite number of hours or days. Instead, provision is for notice "as soon as practicable"; that the notice "shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident." Clearly, the quoted language carries with it all implications, meanings, and uncertainties which such words would likely convey to the average layman. The garnishee was not dealing with experts who might be able to find a suitable formula to be applied. It used the quoted language, which to an ordinary person might well be construed to mean something different from what an expert or college professor might determine its interpretation to be or mean. Defendant was not required as a matter of law to do more than an ordinary person would do who was similarly situated. All it had heard was that a woman many miles distant had suffered from an explosion of impure kerosene purchased at a place far removed from the place where it operated. We think that the garnishee cannot "reasonably" say that as a matter of law defendant should be compelled to go over this large area to investigate each of the three accidents to which we have referred. The language of the required notice is headed "Notice of Accident-Claim or Suit." The last sentence, and the only one that is reasonably clear to a layman, reads: "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every de-

mand, notice, summons or other process received by him or his representative." Obviously, rumor cannot be made the basis for liability as a claim. There must be a claimant, and that person must either directly or through adequate agencies make such claim upon the one whom he thinks or knows to be at fault. Obviously, it would have to be in the nature of a presentation for relief or compensation before it could be said to amount to a demand or claim.

We shall briefly consider and discuss the legal problems presented in the light of our prior decisions. Thus, in Farrell v. Nebraska Ind. Co. 183 Minn. 65, 235 N. W. 612, plaintiffs brought an action against defendant to recover amounts paid by them in settlement of two negligence cases brought against them, the insurance company having refused to defend. There, as here, the issue was whether plaintiffs had given the insurer timely notice under the terms of the policy. The policy provided that "immediate notice" should be given the company. The trial court instructed the jury on that point as follows (183 Minn. 68, 235 N. W. 613):

"The words 'immediate notice' as used in this policy mean notice given within a reasonable time after the occurrence of the event under or on account of which a claim may be made. If the plaintiffs had no reasonable ground for believing that any act or omission by them or their employes was the cause of the running away of the team, *they were not required to give any notice until they became aware of the fact that a claim was to be made upon that ground.* Now, if you find from the evidence that the existing conditions and facts of which the plaintiffs had knowledge would not warrant a reasonable man in believing that any claim would be made against Farrell & Clark, then they were not obliged to give notice until such a claim was made." (Italics supplied.)

We concluded (183 Minn. 69, 235 N. W. 614):

"To hold that defendant under the circumstances should be absolved from liability because of the failure to give earlier notice would be unreasonable, unwarranted, and a grave injustice. *The*

*record does not disclose that defendant was in any way prejudiced by the delay."* (Italics supplied.)

Another case very similar to the one we have before us is Reilly v. Linden, 151 Minn. 1, 186 N. W. 121. There, the action was to recover $5,000 upon an indemnity policy covering defendant's automobile. On August 31, 1917, and while the policy was in full force, Dorothy Reilly, six years of age (151 Minn. 2, 186 N. W. 121)—

"was injured by the car. No written notice of the accident was served upon appellant [insurer] until after the summons and complaint was served on January 2, 1918. On the following day defendant delivered a copy of the summons and complaint together with a notice of the accident to appellant's authorized representative, who directed him to deliver them to its attorneys. The attorneys received the summons and complaint and took a sworn statement of the accident from the insured, retained the summons and complaint for 12 days pending investigation, and on the fifteenth day of January returned the same to the insured with notice that appellant refused to defend the litigation. Thereafter the insured employed counsel, issue was joined and the case finally placed upon the calendar for trial. * * * On March 26, 1920, the garnishee summons was served on appellant, and on April 17 it made disclosure through its said attorneys, admitting the policy and that it was in force at the time of the accident, but disclaiming any debt or liability thereon, for the reason that no written notice of the accident or claim was served upon it as provided therein. Thereafter, upon motion, plaintiff was permitted to file a supplemental complaint under the provisions of G. S. 1913, § 7870, setting forth a waiver of the conditions of the policy requiring immediate written notice of the accident, to which appellant interposed an answer alleging failure of defendant to comply with the conditions of the policy in respect to giving notice, * * *."

As in this case, the insurer had agreed under the terms of its contract to defend any suit brought to enforce a claim for damages. We said (151 Minn. 5, 186 N. W. 122):

"* * * The agreement to defend was a part of the insurer's obligation on account of which the premiums were paid. Its refusal so to do was a violation of the conditions of the contract."

We affirmed plaintiff's recovery.

In Standard Salt & Cement Co. v. National Surety Co. 134 Minn. 121, 158 N. W. 802, the action was upon a bond given for the performance of a contract. The surety company was a paid surety. There, the question was whether an extension of time given the debtor exonerated the insurer from its liability as a surety. We held (134 Minn. 127, 158 N. W. 804) that such "undertakings are in the nature of insurance contracts" (citing cases), and that "Our cases reflect the holdings of other courts. The unmistakable trend is as stated and the result is wholesome." Since no showing of harm to the surety had resulted from the extension, liability was imposed.

Clearly, the policy in the instant case is such an insurance contract. Further discussion or citation of cases is not deemed necessary. We conclude that the findings of the trial court are sustained by the evidence. Other assignments of error have been considered, but we find nothing in any of them requiring discussion.

Order affirmed.