CARGILL, INCORPORATED,
Appellant,

v.

EVANSTON INSURANCE COMPANY,
Respondent.

No. C1–01–1589.

Court of Appeals of Minnesota.

April 16, 2002.

Thomas C. Mielenhausen, Christopher L. Lynch, Lindquist & Vennum, P.L.L.P., St. Paul, for appellant.

Richard P. Mahoney, Victor E. Lund, Mahoney, Dougherty and Mahoney, P.A., Minneapolis, and Jonathan S. Reed, Adam D. Krauss, Traub Eglin Lieberman Straus, Edison, NJ, pro hac vice for respondent.

Considered and decided by RANDALL, Presiding Judge, KLAPHAKE, Judge, and DORIS OHLSEN HUSPENI, Judge.

## OPINION

DORIS OHLSEN HUSPENI, Judge.*

Appellant insured seeks reversal of summary judgment awarded to respondent insurer, and argues that the district court erred in determining that (1) a claim was not made by appellant according to the terms of the insurance policy, (2) notice of the claim was not properly given to respondent by appellant, (3) the other-insurance clause in the policy prevents appellant from qualifying for coverage, and (4) the owned-property exclusion in the policy prevents appellant from qualifying for coverage. Because the district court erred in its application of the law to three of the grounds upon which it granted summary judgment and inappropriately made a factual determination in regard to the fourth ground, we reverse and remand in part.

## FACTS

In February 1979, appellant Cargill, Inc. (Cargill), purchased Stevens Enterprises, Inc. (Stevens), a business located in Daw-son, Georgia, that manufactured pesticides for peanut and cotton farmers. After conducting the pesticide production business for one year, Cargill ceased its operations on the property and permanently turned the Stevens site into a storage facility.

In June 1984, Cargill renewed an environmental impairment liability policy (EIL policy) with respondent Evanston Insurance Company (Evanston); Cargill had been an insured of Evanston since 1980. The renewal policy period was one year, ending June 1, 1985. Later in 1984, after receiving an anonymous tip that large amounts of DDT had been buried at the site 20 to 30 years prior, the Georgia Department of Natural Resources (GDNR) notified Cargill that it was going to conduct an investigation on the Stevens site. In December 1984, a GDNR representative collected soil samples to test for contamination. In January 1985, the GDNR wrote to Charles Westmoreland, Vice President of the Stevens facility, telling him "significant pesticide contamination exists in the soil [at the Stevens facility]." The GDNR stated further,

> [t]he Remedial Actions Unit of the Georgia Environmental Protection Division will contact you shortly regarding measures that will be necessary to clean up the site in accordance with the Georgia Hazardous Waste Management Act.

In response to these assertions, Cargill began to conduct studies on its own, assessing contamination levels in the soil at the Stevens site.

The next contact between Cargill and the GDNR was on April 18, 1985, when the GDNR sent another letter to Charles Westmoreland reiterating that contamination had been found on the site, and requesting that a "thorough remedial investi-

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

gation be conducted by [Cargill] at the site." The letter stated further that the purpose of the investigation was to "determine the nature and extent of the contamination" and "the possible impact any migration of these contaminants may have on the local population and environment through the air, surface-water and groundwater." At the direction of this letter, a meeting between Cargill and GDNR representatives was held in June 1985 to discuss details of the remedial investigation. At this meeting, the GDNR directed Cargill to hire a consultant to conduct a study of the site, and indicated that no public assistance would be available to fund the study. Thus, Cargill was expected to cover study expenses on its own.

In September 1985, Cargill retained Applied Engineering & Science (AES) to conduct a remedial study at the site. In March 1987, AES reported that the Stevens site had widespread, but not substantially dangerous, contamination. AES noted that although the water in the creek adjacent to the site (Brantley Creek) was not contaminated, the sediments in the creek at the site, upstream, and downstream were contaminated at low levels. AES also reported that the surface soil was contaminated, the subsurface soil was for the most part unaffected, the upper groundwater had not been significantly affected, and the lower groundwater was not threatened. Despite these generally favorable results, AES maintained that the site

> represent[ed] a potential environmental and human health threat as surface contamination is exposed to the weather elements including winds and rains which can physically relocate contaminants offsite.

AES suggested several remedial options for Cargill to choose from, ranging in cost from roughly $400,000 to $1.1 million. The GDNR reviewed AES's report and expressed concern stating that the recommendations needed further clarification to ensure that a permanent environmental solution would be achieved at the Stevens site. To further this goal, the GDNR requested additional studies.

On November 24, 1987, Cargill notified Evanston that the GDNR had identified Cargill as the responsible party regarding a remedial investigation at the Stevens site and requested coverage for the claim because it arose during the EIL 1984–1985 policy period. Evanston responded in January 1988, accepting Cargill's submission under a full reservation of rights and alleging it was impossible to determine whether a claim had been made during the policy period. With no acceptance or denial of coverage from Evanston, Cargill moved forward with its remedial work, keeping Evanston apprised of the events transpiring at the Stevens site over the years preceding this litigation.

In March 1997, Evanston notified Cargill that it did not believe Cargill's problems at the Stevens site rose to the level of an insurable claim within the EIL policy period. Evanston also alleged that Cargill did not provide timely notice of a claim under the EIL policy when it waited until 1987 to officially notify Evanston. Cargill continued to update Evanston; Evanston would respond by requesting further proof of a valid claim and by reasserting its reservation of rights.

Cargill brought a declaratory judgment action. After extensive discovery, both parties moved for summary judgment. Evanston's ten separate legal arguments addressed conditions precedent to coverage, policy exclusions, and the equitable doctrine of laches. The district court rejected six of Evanston's arguments, but granted summary judgment for Evanston on the grounds that (1) Cargill failed to

prove a valid claim was made during the policy period, (2) Cargill failed to give timely notice to Evanston, (3) Evanston's policy excluded coverage because Cargill had other insurance policies it needed to exhaust before relying on Evanston, and (4) Cargill was excluded from coverage due to the fact that the contamination was solely contained within its own property. This appeal resulted.

During pendency of this appeal, Evanston moved this court to strike certain documents from Cargill's appendix, claiming they are not properly part of the record on appeal. Cargill opposes this motion.

## ISSUES

1. Are Cargill's arguments on appeal properly before this court?

2. Did Cargill make a valid claim according to the terms of the EIL policy?

3. Was Cargill's notice of a claim to Evanston timely, despite the fact that it occurred nearly three years after the alleged claim was made?

4. Does the EIL policy's other-insurance clause prevent Cargill from establishing coverage from Evanston?

5. Does the owned-property exclusion prevent Cargill from establishing coverage from Evanston?

6. Should certain documents in Cargill's appendix be stricken from the appellate record?

## ANALYSIS

Summary judgment is appropriate when the moving party demonstrates that the pleadings, depositions, answers to interrogatories, admissions, and affidavits demonstrate that there is no genuine issue of any material fact and that either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03; *see also Thiele v. Stich,* 425 N.W.2d 580, 583 (Minn.1988) (placing the burden of demonstrating that no genuine issue of material fact exists for trial on the moving party). On appeal from summary judgment, this court considers whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). No genuine issue of material fact exists when, based on the record, a rational trier of fact could not find for the nonmoving party. *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997). The party opposing summary judgment may not only rest on mere averments; a genuine issue for trial must be established by substantial evidence. *Id.* at 69–71. This court views the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).

## I.

We address initially Evanston's allegation that some of Cargill's arguments on appeal were not raised at the district court. Therefore, argues Evanston, pursuant to the holding in *Thiele,* 425 N.W.2d at 582, Cargill should be prevented from raising these arguments in this court. We find no merit in Evanston's allegation. An examination of the record establishes that all arguments raised by Cargill on appeal were raised in at least one of the several motions Cargill brought during the proceedings before the district court. Consequently, all challenged arguments are properly before this court for consideration on appeal.[1]

---

1. Evanston also reiterates an argument rejected by the district court, and urges that be-

cause Cargill failed to join all interested and necessary parties in the underlying declarato-

## II.

■ Cargill first challenges the district court's determination that no valid claim for coverage was made within the time limits of Evanston's EIL policy period. Evanston's policy defines a "claim" as "a demand received by the Insured for money or services." The district court found that because the GDNR's communications[2] with Cargill from December 1984 to April 1985 were only requests for action, there was no demand for money or services made on the insured within the policy period and, therefore, there was no claim. We disagree.

First, while the tone of the correspondence between the GDNR and Cargill was, indeed, conciliatory, the statutory constraints under which the GDNR must operate mandate a conciliatory tone. Ga. Code Ann. § 12–8–71(a) (2000) requires that the GDNR remedy violations of the Georgia Hazardous Waste Management Act (GHWMA) through "conference, conciliation, and persuasion." Only if these methods fail is the GDNR authorized to issue orders to the offending party, directing the necessary remedial action. Ga. Code. Ann. § 12–8–71(a). While the notifications sent to Cargill did not contain any absolute deadlines within which performance must occur, nor any direct orders for cleanup, the letters did make it clear that remedial investigations needed to be conducted at Cargill's expense. The letters also unequivocally stated that there was contamination on the site requiring the enactment of cleanup measures. Our review of the letters sent to Cargill by

GDNR persuades us that the only uncertainty conveyed concerns the logistics of the cleanup, i.e., when and how, not whether the cleanup was required.

There is no indication that Cargill was free to ignore the requests of GDNR. Although, when read literally, the syntax of the communications did not take the form of demands, their import, when read in the context of the GHWMA, was undeniably a demand for action. Evanston's reliance on a technicality of its policy language to require that a clear "demand for money or services" be stated is unreasonable, in view of the inability of GDNR, as a matter of law, to fulfill those semantic requirements when its first notice of contamination was given.

Minnesota caselaw guides our decision on whether the letters from GDNR constituted a "demand for money or services" under the Evanston policy. In *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn.1995), the supreme court found that a "Request for Information" from the insured can be considered a "suit" triggering the insurer's duty to defend. The court reasoned that because it had determined in an earlier case, *Minn. Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175 (Minn.1990), that covered "damages" in an insurance policy included costs associated with responding to state and federal environmental agencies, it could logically extend this holding to stand for the proposition that a "Request for Information" made by an environmental agency constituted a "suit" for insur-

---

ry judgment action pursuant to Minn.Stat. § 555.11 (2000) and Minn. R. Civ. P. 19.01, the entire action must be dismissed. Because Evanston failed to file a notice of review pursuant to Minn. R.App. P. 106, the issue is not properly before us.

**2.** At the summary judgment motion and on appeal, Evanston argues that any oral communications between Cargill and the GDNR could not be admitted because they are hearsay. Because we find that the content of the letters, alone, constituted a claim during the policy period, the status of the oral conversations becomes moot.

ance coverage purposes. *SCSC*, 536 N.W.2d at 315.

Evanston attempts to distinguish *3M* and *SCSC* on the ground that those cases dealt with commercial general liability policies (CGL policies), whereas Cargill's policy was an EIL policy. While Evanston's assertion of a difference between the policies may be correct, we are aware of no basis for concluding that difference is dispositive. Arguably, the fact that the policy at issue here is designed specifically for environmental liability lends support to our reliance upon *3M* and *SCSC* for guidance. It is, we believe, a proper application of the rationale of *3M* and *SCSC* to hold in this case that conciliatory letters from an environmental agency may constitute a claim or demand triggering insurance coverage, when that agency is required by law to use a conciliatory tone in its communication. We believe a contrary result on this issue would arguably cause reluctance on the part of insureds to cooperate with environmental agencies, lest the opportunity to obtain coverage from insurers would be deemed waived because action was not demanded according to the exact language of the policy.

We reverse the district court's determination that there was no claim made against Cargill during the 1984–1985 Evanston policy period, and conclude as a matter of law that correspondence from GDNR to Cargill during the policy period constituted a claim.

## III.

■ Cargill next challenges the determination of the district court that notification of a claim was not given to Evanston in a timely manner. The district court defined the EIL policy as a claims-made policy [3] that required Cargill to give notice to Evanston as soon as practicable. The court relied on caselaw and Black's Legal Dictionary to determine that "as soon as practicable" means as soon as is performable or feasible. From this definition, the court concluded that Cargill's decision to wait longer than two years to notify Evanston after being contacted by the GDNR was unreasonable. The inference we draw from the district court's decision is that no fact-finder could reasonably find that Cargill provided notice to Evanston as soon as practicable. *See DLH, Inc.*, 566 N.W.2d at 69 (stating that summary judgment is appropriate when a rational trier of fact could not find for the nonmoving party).

■ Generally, whether the notice was given as soon as practicable is a fact-dependent question for a jury to determine. *See St. Paul Fire & Marine Ins. Co. v. Wabash Fire & Cas. Ins. Co.*, 264 F.Supp. 637, 642–43 (D.Minn.1967) (stating that what constitutes notice "as soon as practicable" is a determination to be made taking into account all the facts and cir-

---

3. A claims-made policy requires the insured to give notice of the claim during the policy period. *N.K.K. Knudson v. St. Paul Fire & Marine Ins. Co.*, 555 N.W.2d 21, 25 (Minn. App.1996), *review denied* (Minn. Dec. 23, 1996); *see also Esmailzadeh v. Johnson & Speakman*, 869 F.2d 422, 424 (8th Cir.1989) (stating that claims-made policies are those under which both claim against insured and notice to insurer are provided within term of the policy). The Evanston policy did not require notice to be given during the policy period, but instead only required that notice be given as soon as practicable. As such, it does not precisely fit the definition of a claims-made policy in Minnesota. Neither is the Evanston policy an occurrence policy; it does not require that the act giving rise to the claim occur within the policy period. *See N.K.K.*, 555 N.W.2d at 25 (stating that occurrence policy requires the negligent act to occur during policy period). Ultimately, classification of the Evanston policy is irrelevant to an analysis of the issue needing decision: did Cargill give notice as soon as practicable?

cumstances of the particular case); *Williams v. Cass–Crow Wing Co-op. Ass'n,* 224 Minn. 275, 283, 28 N.W.2d 646, 650–51 (1947) (immediate notice requirement has same standard). A court may grant summary judgment, however, when there is no genuine issue of material fact. *DLH, Inc.,* 566 N.W.2d at 71. There is no genuine issue of material fact when the nonmoving party presents evidence creating only a metaphysical doubt as to a factual issue or the evidence is not sufficiently probative to permit reasonable persons to draw different conclusions. *Id.*

In this case, Cargill claims it waited as long as it did to notify Evanston due to the presence of a $1 million deductible provision in the Evanston policy. Cargill argues that it would have been pointless to notify Evanston at an earlier time because Cargill's costs in relation to the cleanup had not exceeded the $1 million limit. This court makes no assessment regarding the ultimate success of this argument. We conclude, however, that it would not be wholly unreasonable for a fact-finder to determine that, under the circumstances, it was practical for Cargill to wait until the $1 million deductible was exceeded. Cargill should have been permitted to make its argument to a fact-finder.

■ While Cargill argues that the timing of notice is irrelevant if Evanston cannot establish that it was prejudiced by any delay, we agree with the district court that there is no merit to this argument. Evanston should not be required to make a showing of prejudice. If the "notice of loss * * * is a condition precedent of liability under the insurance contract, * * * noncompliance with that provision is fatal to recovery." *Sterling State Bank v. Va. Sur. Co.,* 285 Minn. 348, 354–55, 173 N.W.2d 342, 346 (1969). The language of the Evanston policy unambiguously states that

*[a]s a condition precedent* to his right to the protection afforded by this policy, the Insured shall, as soon as practicable, give to the Company written notice * * * of any claim made against him.

(Emphasis added.) Therefore, on remand, the fact-finder shall not consider whether the timing of Cargill's notice prejudiced Evanston.

We conclude that summary judgment was inappropriately granted on the issue of notice and remand this issue to the district court for resolution by the fact-finder.

**IV.**

■ In its third argument, Cargill challenges (1) the district court's decision that the other-insurance clause in the Evanston policy compelled Cargill to seek coverage from its other insurance providers before turning to Evanston, and (2) the district court's conclusion that another insurance company had offered to defend Cargill, but Cargill had refused.

■ Turning to the first basis relied upon by the district court in deciding the other-insurance issue, i.e., that Evanston's insurance was excess, we note that the court appeared to look no further than the language of the clause itself, which provides:

This insurance shall be in excess of the amount of the applicable deductible of this policy and any other *valid and collectible insurance available to the Insured* whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

(Emphasis added.) Inclusion of "excess" language in a policy, however, does not automatically qualify that policy as excess.

*Interstate Fire & Cas. Co. v. Auto–Owners Ins. Co.*, 433 N.W.2d 82, 86 (Minn.1988). In *Interstate*, the supreme court found that despite having a pro rata other-insurance clause in its policy, appellant insurance company's policy was not an excess/umbrella one in relation to respondent insurance company because appellant did not specifically name respondent insurance company as an underlying insurer in its other-insurance provision. *Id.* Consequently, the relationship between the two insurance companies was never specifically defined; further analysis was necessary to determine which policy provided primary coverage. *Id.* Similarly, in the present case, Evanston's other-insurance clause does not name any of Cargill's other policies as underlying insurance that must be exhausted prior to Evanston's involvement. Therefore, there is no specifically defined relationship between the Evanston policy and any of Cargill's other policies. Further analysis is needed to determine whether Evanston is a primary insurer for Cargill's claims at the Dawson site, and we must remand this issue to the district court.

█ In conformance with Minnesota law, priority among insurance policies is not to be determined by the presence or absence of other-insurance clauses, but by an analysis of the function and intent of the policies. *See, e.g., Bettenburg v. Employers Liab. Assurance Corp.*, 350 F.Supp. 873, 876 (D.Minn.1972). Minnesota has used two tests for this purpose: the "closest-to-the-risk" test as in *Interstate*, 433 N.W.2d at 86, and the "total-policy-insuring-intent" test as in *Garrick v.*

*Northland Ins. Co.*, 469 N.W.2d 709, 712 (Minn.1991).

The "closest-to-the-risk" test asks three questions:

1. Which policy specifically described the accident causing instrumentality?
2. Which premium is reflective of the greater contemplated exposure?
3. Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy—that is, is the coverage of the risk primary in one policy and incidental to the other?

*Interstate*, 433 N.W.2d at 86 (quotation omitted). The "total-policy-insuring-intent" test examines "the primary policy risks and the primary function of each policy." *Redeemer Covenant Church v. Church Mut. Ins. Co.*, 567 N.W.2d 71, 80–81 (Minn.App.1997), *review denied* (Minn. Oct. 1, 1997) (citation omitted).

In its summary judgment order, the district court concluded that *Redeemer* was distinguishable from this case because in *Redeemer* the intent-based tests were performed only after determination that the insurer was obligated to provide coverage. The district court reasoned that because it did not find that Evanston was required to provide coverage to Cargill, it did not have to engage in the test suggested in *Redeemer.* But because we have determined that a claim was made against Cargill within Evanston's policy period and that Cargill's notice may be found to be timely, Evanston may, indeed have a duty to indemnify. Thus, whether its status was primary or secondary to other policies Cargill had at the time in question [4] must be determined

4. The district court concluded that Cargill should have sought coverage from Continental before seeking coverage under the Evanston policy because Continental made an offer to provide coverage to Cargill. The record reveals, however, that while Continental did

offer to provide coverage, it did so under a reservation of all rights until a further inspection of the claim could be made. Continental's reservation of rights permitted it to withdraw its offer at any time, in effect providing Cargill with no more promising an option for

by utilizing either or both of the tests set out in *Redeemer.*

## V.

 In its fourth challenge, Cargill claims that the district court erred in interpreting the owned-property exclusion of the Evanston policy as prohibiting Cargill from seeking coverage from Evanston. There is merit in Cargill's challenge.

The EIL policy states that coverage will not apply to claims for ·

damage to property: (a) owned or occupied by or rented to any Insured, or (b) used by any Insured, or (c) in the care, custody or control of any Insured.

The district court, in granting summary judgment to Evanston pursuant to this clause, found that the contaminated groundwater was part of Cargill's property. In making this finding, the court relied on Georgia caselaw holding that groundwater is part of the owner's property to the extent it is below the owner's property. *Boardman Petroleum, Inc. v. Fed. Mut. Ins.*, 269 Ga. 326, 498 S.E.2d 492, 495 (1998).

To support its decision to use Georgia law, the district court stated that of all the states potentially involved, Georgia has the strongest interest in determining how property within its borders is defined, and that to apply another state's definition of groundwater would manifest disrespect for Georgia. *See Milkovich v. Saari*, 295 Minn. 155, 164–171, 203 N.W.2d 408, 413–17 (1973) (listing the five factors to be considered when choosing the applicable law as: (1) predictability of results, (2) maintenance of interstate order, (3) advancement of the forum's governmental interests, (4) application of the better rule of law, and (5) simplification of the judicial task).

We conclude that it was error to apply Georgia law in clarifying the meaning of an exclusion clause in an insurance contract between a Minnesota company and an Illinois insurer. While Georgia has a strong interest in cleaning up contamination discovered within its borders, it has comparatively minimal interest in determining who should pay for the cleanup of that contamination. Further, the policy at issue here is one covering all of Cargill's properties that have exposure to environmental damages claims, regardless of the jurisdiction in which those claims may arise. Application of Georgia law in this case would indicate that the law of each state where Cargill's properties are located could potentially control whether Cargill has insurance coverage under the EIL policy. It strains credulity to believe that either party to this contract of insurance could have intended such a result.

The contract of insurance in this case was signed in Minnesota; the parties involved are a Minnesota company incorporated in Delaware and an Illinois insurance company licensed to sell insurance in Minnesota. The record shows that the

coverage than that provided by Evanston or any other potential insurer. Furthermore, the record reveals that Continental's policy period was from 1971–1974. In view of our determination that a claim was made by GDNR in 1984, it is unlikely that Continental would agree to provide coverage for a claim occurring ten years after the end of its policy period. Further, it is not clear from our review of the record whether any of Cargill's other policies in effect at the time of the claim would provide coverage. Neither is it clear that the record on appeal even contains all policies available to Cargill at the time of the claim. Cargill offers a list of policies it claims were in existence at the same time as the Evanston policy; Evanston has offered its own list of different policies. Upon remand, the district court, in its discretion, may permit receipt of further evidence or argument on this issue.

contract contained no choice-of-law provision indicating that the law of a certain state should apply in the event of a legal dispute. From these facts, it appears that if any states are to be involved in a choice-of-law analysis, it should be Minnesota and Illinois, the home states of the parties to the litigation.

Before a choice-of-law analysis is applied, this court must first determine if there is a conflict between the laws of the two forums. *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93–94 (Minn.2000). In Minnesota, groundwater is considered part of the public domain. *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 734 (Minn.1997). Groundwater is also part of the public domain in Illinois. *See* 525 Ill. Comp. Stat. §§ 45/1—45/7 (2000) (Water Use Act of 1983, governing the use and withdrawal of groundwater in Illinois.). With no conflict, no further choice-of-law analysis is needed. In both Minnesota and Illinois, groundwater is not part of the owned property and its contamination establishes that offsite contamination exists. Because the law of Georgia was improperly applied to determine the status of groundwater, and because both Minnesota and Illinois law would deem groundwater to be part of the public domain, summary judgment on this ground to Evanston was improper and must be reversed.

## VI.

A final issue requires consideration. During the pendency of this appeal, Evanston moved to strike certain documents from Cargill's appendix to its brief. Evanston alleges that these challenged documents contain information not submitted to either Evanston or the district court. Upon careful review of the record before both this court and the district court, we deny Evanston's motion.

First, a challenged January 2001 letter from GDNR to Cargill, submitted by Cargill in an attempt to establish that the owned-property exclusion of the EIL policy does not apply, has no relevance to the facts of this case, and has in no way informed our decision. As noted earlier in this opinion, both Minnesota and Illinois law classify groundwater as a public resource.

Second, Evanston challenges charts summarizing Cargill's other insurance policies in existence during the period that Evanston provided coverage. But these charts merely condense information already in the record; Evanston appears to concede as much in its motion. *See Truesdale v. Friedman*, 267 Minn. 402, 405–06, 127 N.W.2d 277, 280 (1964) (allowing parties to shorten the printed record as much as possible without jeopardizing the arguments advanced on appeal). It appears that Evanston's objection is based upon a belief that Cargill circumvented page limit requirements by including these charts in the appendix instead of in its brief.

A last challenge by Evanston is addressed to admission of proof of an insurance policy providing coverage to Cargill from 1978 to 1981. But this policy has no relevance to the question of whether Evanston should provide coverage to Cargill under the policy at issue here and has not been considered by us in addressing that issue.

## DECISION

When the GDNR sent its first letter to Cargill in 1984 requesting that remedial measures be instituted at the Stevens site, a claim was made within the EIL policy period. Because neither Minnesota law nor Illinois law defines groundwater as owned property, the contamination at the Stevens site is properly characterized as offsite contamination and the owned prop-

erty exclusion in the EIL policy does not apply. As such, the award of summary judgment on these two issues is reversed. Whether Cargill supplied timely notice of a claim to Evanston, is a question of fact; therefore, we reverse the award of summary judgment to Evanston on this basis and remand for resolution by the fact-finder. Furthermore, we reverse the award of summary judgment granted on the basis of the other-insurance clause in the Evanston policy and remand that issue for further proceedings not inconsistent with this opinion. We deny Evanston's motion to strike.

**Reversed and remanded in part; motion denied.**