In the

# United States Court of Appeals
## For the Seventh Circuit

—————————

No. 19-3129

WISCONSIN CENTRAL LTD.,

*Plaintiff-Appellant*,

*v.*

SOO LINE RAILROAD COMPANY,

*Defendant-Appellee*.

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-04271 — **Andrea R. Wood**, *Judge*.

—————————

ARGUED SEPTEMBER 25, 2020 — DECIDED MARCH 31, 2021

—————————

Before RIPPLE, BRENNAN, and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Decades ago, railroad company Wisconsin Central, Ltd. entered into an agreement that included the purchase of rail lines from Soo Line Railroad Company. Part of that agreement allocated responsibility for future environmental liabilities. Years later, contamination was discovered near one of those lines in Ashland, Wisconsin on the shore of Lake Superior.

The railroads jointly defended and settled responsibility for the investigation and remediation of that site. Then they each sought indemnification from the other. The district court awarded summary judgment to Soo Line for damages, attorneys' fees, and costs.

On appeal, the railroads dispute when a claim was first asserted, and how much of the cost of defending and settling the matter was related to the rail lines and their operation. Indemnification under the agreement turns on both issues.

## I.

In a 1987 Asset Purchase Agreement ("Agreement") Wisconsin Central purchased various assets of Soo Line's Lake States Transportation division, including physical rail lines in Minnesota, Wisconsin, and Michigan ("LST").[1] The Agreement provided for a detailed allocation of liability and indemnification of each party by the other. An initial version of the Agreement had provided that Wisconsin Central would assume all of Soo Line's liability for environmental claims except those arising out of Soo Line's acts or omissions. But Wisconsin Central's lenders threatened to withdraw from the deal out of concern that future environmental claims might threaten Wisconsin Central's ability to repay them. In order to assure the lenders and allow the deal to go forward, Soo Line agreed to retain liability and indemnify Wisconsin

---

[1] The Agreement does not use the phrase "Lake States Transportation" and instead lists "LST"—defined only as the lines of railroad listed in an exhibit—as one of the many assets sold to Wisconsin Central. Both parties agree the overall contract was for the sale of assets of the Lake States Transportation division.

Central for "all claims for environmental matters relating to ownership of the Assets or the operation of LST that are asserted" within ten years of the closing of the deal (the "claim period").[2] This window appears to have been derived from the repayment period of the loans plus extra time to be safe from clawbacks under the bankruptcy code. After the end of the claim period, Wisconsin Central would in turn assume all liability and indemnify Soo Line for any such claims, regardless of whether Soo Line was at fault. The deal finally closed on October 11, 1987, and the claim period ran through October 11, 1997.

A few years into the Agreement, local and state authorities discovered contamination in Ashland in what used to be an industrial area but is now a public recreational area called Kreher Park. Running through the park is a railroad right-of-way purchased by Wisconsin Central under the Agreement. The Wisconsin Department of Natural Resources ("WDNR") identified an old manufactured gas plant as the likely source of the contamination, and the agency issued a "potentially responsible party" ("PRP") letter to its owner, Northern States Power Company ("Northern States"), requiring it to investigate and potentially clean up the contamination.

Upon being named a PRP for the Kreher Park contamination, Northern States undertook an extensive campaign to shift responsibility to the railroads. It hired an investigator who searched historical records and conducted interviews. Some residents remembered that rail cars regularly dumped

---

[2]   Although the briefs and the district court record refer to two separate claim periods, we refer to "claim period" as that time span between the Agreement's closing through its ten-year anniversary.

waste onto the ground, and those who had lived in the area as children recalled seeing coal tar while playing near the tracks. Northern States officials spoke to the local press, expressing their belief that the railroads shared liability for the cleanup. Northern States urged the WDNR to name the railroads as PRPs "as soon as possible." Representatives from Northern States even delivered a presentation to the WDNR titled "WISCONSIN CENTRAL LIMITED Is a Responsible Party At This Site" with subheadings such as "Has Successor Liability Just Like [Northern States Power]" and "Owns Property Contaminated With Hazardous Substance."

In addition, Northern States tried to convince Wisconsin Central to voluntarily join the clean-up effort. It sent Wisconsin Central a report summarizing its interviews of former area residents. Northern States and Wisconsin Central met to discuss the railroad's "potential responsibility for environmental issues at Kreher Park." At this meeting, Northern States again presented its case that the railroads were responsible for the environmental contamination. Northern States tried its best to persuade the railroads that action by the WDNR was inevitable and that it would behoove them to voluntarily involve themselves in the cleanup.

Wisconsin Central kept Soo Line apprised of the situation. It faxed Soo Line the press article in which Northern States had claimed that the railroads shared responsibility for the contamination. It wrote to Soo Line before and after its meeting with Northern States. In one letter, Wisconsin Central's in-house counsel told Soo Line she believed that even if Northern States's efforts to get the WDNR to include the railroads were unsuccessful, at some point Northern States would "have to get us involved."

At one point during the claim period, Wisconsin Central's in-house counsel met with her Soo Line counterpart to discuss the circumstances.[3] Both parties allegedly agreed that they should take a cooperative stance with Northern States and the WDNR, but that it would be a mistake to affirmatively seek a PRP letter. Wisconsin Central went on to meet with Northern States's representatives, who presented their evidence tying the railroads to the environmental issues at Kreher Park. But at no point during the claim period did Northern States or the WDNR threaten to take legal action against either railroad company.

Perhaps anxious about the impending shift in liability, Wisconsin Central sent notification to Soo Line in January 1997—nine months before the end of the claim period—that it was seeking indemnification for various environmental matters, including at Kreher Park. Soo Line did not agree to indemnify or defend Wisconsin Central.[4]

Years later, in 2002, the Environmental Protection Agency became involved and designated an area including Kreher Park as a Superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Northern States, continuing its campaign to shift responsibility to the railroads,

---

[3]   Soo Line's attorney does not remember whether this meeting, which allegedly took place at some point before Wisconsin Central met with Northern States representatives, occurred. Even if the meeting happened as Wisconsin Central's attorney recalls it, it would not affect our decision, as we explain below.

[4]   Many years after the EPA became involved, the parties reached a settlement as to indemnification for the other environmental matters but left the Kreher Park matter unresolved.

began lobbying the EPA with the same evidence that it had previously presented to the WDNR. Finally, in 2011, the EPA issued formal notice to Wisconsin Central, Soo Line, Northern States, and others, that they were PRPs for the Superfund site. In 2012, Northern States initiated its own legal action in federal court, filing suit against Wisconsin Central, Soo Line, and the City of Ashland for recovery of the expenses it had incurred cleaning up the Kreher Park area. For the benefit of the parties' settlement discussions, the EPA relayed it had credible evidence that the railroads engaged in two activities contributing to the contamination: the dumping of waste from rail cars at the site and the dredging around two docks at the site (the commercial dock and the ore dock). The EPA also mentioned a third activity—the treating of rail ties—for which it had evidence but had not yet reached a conclusion. Wisconsin Central and Soo Line ultimately signed a consent decree and settled the claims by the EPA and Northern States for a combined $10.5 million plus interest, with each railroad paying half of that amount and reserving the right to seek indemnification from the other. Northern States continued to try to recover the rest of its investigation and remediation expenses from other parties.

Wisconsin Central then filed this breach of contract action against Soo Line, arguing that the environmental claims were asserted during the claim period and that Wisconsin Central was entitled to indemnification for the entire amount that it paid in the settlement, plus interest, fees, and costs. Soo Line brought a counterclaim for the same, arguing that no claim was asserted until after the claim period had expired. The district court granted summary judgment to Soo Line, finding that no claim had been asserted against the railroads during the claim period and that, as a result, Soo Line was entitled to

indemnification by Wisconsin Central. The district court promptly entered judgment on behalf of Soo Line.

Following this entry, Wisconsin Central moved to withdraw the court's judgment under Federal Rules of Civil Procedure 59(e) and 60(a). For the first time, Wisconsin Central argued that it should not be responsible for the portion of the environmental claims attributable to operations and land owned by Soo Line or its predecessors in the Kreher Park area but not purchased by Wisconsin Central. Wisconsin Central contended that its duty to indemnify was limited to the percentage of Soo Line's historic holdings in the Kreher Park area that it had acquired.[5] Under a proper allocation of liability, Wisconsin Central asserted it should be responsible for only a small percentage—about $431,000 out of almost $5.3 million—of Soo Line's half of the parties' settlement with the EPA and Northern States. Wisconsin Central also maintained that Soo Line's attorneys' fees—about $5.1 million—were excessive and should be reduced to about $1.3 million.

Soo Line expressed surprise at Wisconsin Central raising the damages allocation issue when it did. Discovery for damages was to follow the adjudication of liability, but Soo Line argued that was meant just for the final calculation of attorney fees, costs, and the like, not for a substantive contest about the

---

[5]  On appeal, Wisconsin Central focuses on the dredging—cited by the EPA as contributing to the environmental contamination—of the commercial dock on this site once owned by Soo Line but deeded to a third-party several years before the Agreement at issue here.

extent of indemnification and associated dollar amount.[6] Soo Line accused Wisconsin Central of trying to relitigate what it lost at summary judgment. Nonetheless, the district court entertained Wisconsin Central's argument.[7] After consideration, the district court again ruled against Wisconsin Central because it was "undisputed that the Superfund claims arose from the operation of the Lake States Transportation division." The court awarded Soo Line damages of $10,799,427, plus prejudgment interest, as well as $1,776,764 for attorneys' fees for the present case.

Wisconsin Central now appeals. It insists that the environmental claims against the railroads were first asserted during the claim period and that Soo Line must therefore indemnify

---

[6] This sequence leads us to remind district courts not to enter judgment orders until the parties' claims are fully resolved. If the entry of judgment does not make clear what the prevailing party is entitled to—here, no dollar amount had been set—then piecemeal and potentially wasteful appeals may follow. *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 708 (7th Cir. 1999).

The question of whether judgment was properly entered can put parties in a difficult position. An appeal could be dismissed for lack of finality. But waiting for the district court to correct the judgment risks waiving their right to appeal altogether if the entry of judgment is held to have been proper. *Id*. ("As bad as multiple appeals in the same case is uncertainty when and whether an appeal is possible.").

[7] Soo Line questions Wisconsin Central's maneuver to raise this issue after summary judgment was granted. While we caution against the entry of a premature judgment, on that question here we defer to the district court's "broad discretion to manage" its docket. *See A. Bauer Mech., Inc. v. Joint Arbitration Bd. of Plumbing Contractors' Ass'n, et al.*, 562 F.3d 784, 790 (7th Cir. 2009).

it for the entire cost of the claims. Even if the environmental claims were not asserted until after the claim period, Wisconsin Central submits it should be responsible for only the portion of the environmental damages attributable to the exact land and operations that it bought from Soo Line.

## II.

We review a district court's decision on summary judgment de novo, construing all facts and drawing all inferences in the light most favorable to the non-moving party. *Egan Marine Corp. v. Great Am. Ins. Co. of New York*, 665 F.3d 800, 811 (7th Cir. 2011). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Both parties agree that Minnesota law governs the interpretation of the Agreement.[8]

## A.

The relevant part of the Agreement's indemnification clause states:

> "… [Wisconsin Central] shall assume the following liabilities and obligations of Soo [Line]: …all claims for environmental matters relating to the ownership of the Assets or the operation of LST that are asserted after the tenth anniversary of the Closing Date …"[9]

---

[8]   Agreement § 31, Supp. App'x 25. The district court had diversity jurisdiction under 28 U.S.C. § 1332, and this court has jurisdiction to review the district court's judgment under 28 U.S.C. § 1291.

[9]   Agreement (as amended) § 4(a)(v)(3), Supp. App'x 34.

Liability under this clause depends on whether a "claim" was "asserted" against the railroads within the claim period. The parties debate what constitutes a "claim" under Minnesota law, and whether actions by Northern States or environmental regulators satisfied that definition.

1.

Wisconsin Central argues that Minnesota law takes a broad view of the actions and communications that qualify as "claims," especially in the environmental context. It points to various cases in support of this proposition, three of which merit discussion.

*Cargill, Inc. v. Evanston Ins. Co.* concerned a dispute somewhat similar to this one. 642 N.W.2d 80 (Minn. Ct. App. 2002). A Georgia environmental regulator had sent a letter asking Cargill to conduct a remedial investigation of contamination at a site. *Id.* at 82–83. Cargill was insured for environmental claims at the time it received the letter, but its insurer later disclaimed responsibility, arguing that because the letter was a mere request and the regulator had not taken further action until after the end of the coverage period, no eligible claim had been made against Cargill while it was insured. *Id.* at 83–84. The Minnesota Court of Appeals disagreed, holding that the regulator's initial letter constituted a "claim" for purposes of triggering insurance coverage even though "the syntax of the communications did not take the form of demands." *Id.* at 85–86. The court noted that Georgia law required the environmental regulator to first act through "conference, conciliation, and persuasion" before resorting to the issuance of formal orders. To the court, it was clear that Cargill was not "free to ignore" the letter, which was "undeniably a demand for action" despite its superficially conciliatory tone. *Id.* at 85.

Wisconsin Central also cites *SCSC Corp. v. Allied Mut. Ins. Co.*, in which the Minnesota Supreme Court held that a Request for Information letter from a Minnesota environmental regulator was not just a mere "claim" but in fact a full-blown "suit" despite the insurance company's argument that the letter did "not carry the threatening, coercive tone of a lawsuit." 536 N.W.2d 305, 315 (Minn. 1995). The court approvingly cited an Iowa case that defined a suit as an attempt to gain an end by legal process and a Ninth Circuit case that called a PRP letter from the EPA a suit because an "'ordinary' person would perceive such a letter as notice of the effective commencement of a 'suit' necessitating legal defense." *Id.* (citing *A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 626–29 (Iowa 1991), and *Aetna Casualty & Sur. Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507, 1516–17 (9th Cir. 1991)).

To these cases Wisconsin Central adds a similar ruling under Texas law. In *International Ins. Co. v. RSR Corp.*, the Fifth Circuit held that a jury was justified in finding that a "claim" arose under Texas law when the EPA placed a facility owned by RSR on its National Priorities List, also known as the Superfund list. 426 F.3d 281, 297 (5th Cir. 2005). The jury had heard testimony to the effect that the EPA almost inevitably initiates formal adversarial action against the owner of properties placed on the list. *Id.* at 298. The Fifth Circuit noted that placement on the list has immediate negative consequences for the owner of the listed property. *Id.* at 297. Those include loss of business reputation and loss of property value. *Id.* Delisting can only occur "where no further response is appropriate" and requires approval of the state where the property is listed as well as a public notice and comment period. *Id.* at 297–98. The court also observed that the government had the

right to hold RSR strictly liable for the environmental contamination on the property it owned. *Id.* at 298.

In all these cases, a government regulator took some formal action against the party or the property of the party against whom a "claim" (or "suit") was then deemed to have been asserted.[10] "Potentially Responsible Party" and "Request for Information" letters bear deceptive names. Such communications are not friendly requests for materials, or mere notices that a party might become liable in the future. Rather, they are the formal mechanisms by which a party is brought under the authority of the regulator. *See Land O'Lakes v. Emp'rs Mut. Liab. Ins. of Wis.*, 846 F. Supp. 2d 1007, 1020 (D. Minn. 2012) (observing that a PRP letter was not just a "polite invitation … to engage in conversation").[11] In the cases Wisconsin Central cites, most of the regulators' actions—like the sending of a Request for Information or a Potentially Responsible Party letter—immediately levied costly legal obligations on their recipients. They also imposed near certain risks of

---

[10] And in *International Ins. Co. v. RSR Corp.*, the Fifth Circuit considered various definitions of "claim" but upheld a jury instruction with a broad definition, in part because that case concerned an insurance policy that Texas law required be construed in favor of the insured. 426 F.3d at 290–95, 298 (5th Cir. 2005).

[11] For example, under Wisconsin law, once a PRP is determined to be a responsible party, it acquires extensive obligations to investigate and to contribute to the cleanup of the site. WIS. ADMIN. CODE NR §§ 716, 722 (detailing the obligations of responsible parties to investigate and remediate environmental contamination).

And in a case widely cited by state and federal courts, *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 264 Wis. 2d 60, 72, 665 N.W.2d 257, 264 (2003), a PRP letter from the EPA or equivalent state agency qualifies as a "suit" for purposes of insurance contracts.

further adversarial action on the parties. The Ninth Circuit's discussion of this point in *Aetna* (cited in the *SCSC* case) is instructive:

> The extent of CERCLA liability is far-reaching. … In order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must get involved from the outset. In many instances, it is more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action. … [I]f a person who is liable for a release or threat of release of a hazardous substance fails [to take remedial action] … the EPA can choose to proceed with a Superfund-financed cleanup, and then seek punitive damages. Lack of cooperation may expose the insured, and potentially its insurers, to much greater liability …

948 F.2d at 1517. As the cases above show, the same principle applies to state environmental regulators. To Wisconsin Central, these authorities demonstrate how the actions of the various players here constituted a "claim" within the claim period.

Here, however, the facts show that the WDNR took no action against the railroads during the claim period. The cases above all turn on the official actions of environmental regulators. But Wisconsin Central does not argue that the WDNR asserted a claim against the railroads during the claim period. It argues Northern States, a private company, asserted a claim. Private parties are not government regulators. *See Zecco, Inc. v. Travelers, Inc.*, 938 F. Supp. 65, 68 (D. Mass. 1996) (observing that "the distinction between a letter from the government and one from a private party is significant" when

deciding whether a "suit" has been initiated for purposes of insurance coverage). And no authority Wisconsin Central cites recognizes a transitive property that converts Northern States's efforts—to convince the regulator to send a PRP letter to the railroads and to persuade the railroads to voluntarily join the cleanup effort—into the equivalent of a regulator actually sending a PRP letter or taking other official action that would constitute a "claim."

2.

In contrast to environmental regulators, who can speak softly but carry a big stick, Northern States bellowed at the top of its lungs. But its efforts to involve the railroads in the environmental investigation failed—until the EPA became interested in the Kreher Park site and decided to name the railroads as PRPs. This occurred many years after the claim period ended. Still, Wisconsin Central argues that the actions of Northern States during the claim period constituted the assertion of a "claim" against the railroads.

Beyond cases involving regulators, Wisconsin Central cites *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.* for what it means to assert a "claim." 796 F.3d 962 (8th Cir. 2015). There, the Eighth Circuit affirmed a district court's holding that, under Minnesota law, "an *assertion* by a third party that the insured may be liable to it for damages within the risks covered by the Policy" constitutes a "claim." *Id.* at 967 (emphasis supplied). The Eighth Circuit reached this conclusion, though, only by interpreting the term "'assertion' … to mean something more than just a mere statement of facts already occurred but rather an assertion of a right to relief, i.e., demand for relief." *Id.* at 969. The appeals court cited case law which focused on this "demand for relief" or "assertion of a right" requirement. *Id.*

at 968–69. That court also noted that its interpretation was consistent with the relevant dictionary definitions of "claim"—"[t]he assertion of an existing right" and "[a] demand for money, property, or a legal remedy to which one asserts a right." *Id.* at 967 (referencing *Claim*, BLACK'S LAW DICTIONARY). The Eighth Circuit was able to square this reading with the record because the district court, in its summary judgment order, had itself used "demand" to characterize the actions that amounted to a "claim." *Id.* at 969 n.6.

Northern States's actions do not meet this definition of "claim." The problem is not that Northern States failed to include in its communications a monetary amount or the precise legal basis for its right to relief—Wisconsin Central forcefully argues that those are not requirements for the existence of a claim. Rather, Northern States did not assert any right to relief, nor make any demands for relief, against either railroad during the claim period. The only "assertions" Northern States made were that the railroads were responsible for pollution at Kreher Park and that the WDNR might and should name them as PRPs. Northern States did not make any demands either. If Northern States had sued, threatened to sue, or demanded that the railroads join the investigation because they owed Northern States a legal duty, then a claim would have been asserted. Making comments to the press, asking a party to voluntarily contribute, unsuccessfully asking (even begging) a third party to assert a claim, and meeting with parties to try to persuade them to voluntarily join a remediation effort by convincing them that a regulator will take formal action—all of these are distinct from "asserting a claim."

Wisconsin Central characterizes Northern States's actions differently, as more than mere persuasion. Underlying Northern States's requests, Wisconsin Central submits, was a right to take legal action, which in turn would fit within the definition of either "assertion of a right" or "demand for relief," and therefore constitute a "claim." So the parties debate whether Northern States could have initiated legal action, even if it wanted to.

Soo Line responds, agreeing with the district court, that the law prevented Northern States from bringing a claim against the railroads during the claim period. This is because Wis. Stat. ch. 292, known as the Wisconsin spills law, does not provide for a private right of action, *Grube v. Daun*, 210 Wis. 2d 682, 692, 563 N.W.2d 523, 527–28 (1997); PRPs were not allowed to bring cost recovery actions under Section 107 of CERCLA, *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994); and parties who had not yet faced a federal lawsuit or entered into a settlement could not bring contribution actions under Section 113 of CERCLA, as this court later recognized in *Bernstein v. Bankert*, 733 F.3d 190, 201 (7th Cir. 2013).

But, as Wisconsin Central replies, CERCLA contribution and cost recovery suits were hotly litigated areas, and the law during the claim period remained in flux. Despite this court's 1994 ruling in *Azko*, we later held that PRPs could bring cost recovery actions under Section 107. *Bernstein*, 733 F.3d at 201 (2013). And this court's holding in *Bernstein* as to Section 113 was based on a 2004 Supreme Court case that clarified the interpretation of CERCLA. *Id.* A 1997 Northern District of Indiana case, for example, had held the opposite: that a PRP could bring a Section 113 action even before facing a federal lawsuit

or entering into a settlement. *Ninth Ave. Remedial Grp. v. Allis Chalmers Corp.*, 974 F. Supp. 684, 691 (N.D. Ind. 1997). Soo Line responds that despite incurring extensive investigation and cleanup costs at the site, Northern States did not bring a contribution action until many years later—after the EPA became involved—suggesting it did not believe that it previously had the authority to sue.

We conclude that Northern States might have had a viable cause of action during the claim period against the railroads. But the existence of an uninvoked right to sue does not decide whether a "claim" was "asserted." Even if it had a claim or *thought* it had a claim, Northern States did not sue, did not threaten to sue, and did not even allude to its right to sue either railroad during the claim period.[12]

---

[12] Wisconsin Central, citing *Nischke v. Farmers & Merchants Bank & Tr.*, also contends that Northern States could have brought a negligence suit against the railroads, arguing that a plaintiff can recover in negligence for remediation efforts that Wisconsin environmental law forced her to take. 187 Wis. 2d 96, 522 N.W.2d 542 (Ct. App. 1994). But the discussion in *Nischke* did not involve whether the plaintiff had the right to sue—that was established by the damage to the plaintiff's property. Because she had a duty under Wisconsin environmental laws to take remedial measures, the court made an exception to the general rule that damages are limited to the lesser of the cost to repair or the decrease in the property's value. *Id*. at 118–120, 551–52. And Soo Line correctly notes that under Wisconsin law, a plaintiff in a negligence suit cannot recover for damage to another's property. *Wausau Tile, Inc. v. Cty. Concrete Corp.*, 226 Wis. 2d 235, 253, 593 N.W.2d 445, 454 (1999) (characterizing a claim for damages to third-party's property for which plaintiff was responsible for repairing as a claim for economic loss not cognizable under negligence).

In the 2012 federal lawsuit against the railroads and the City of Ashland, Northern States included negligence counts against the railroads.

In further support of its position, Wisconsin Central points to communications between the railroads to show it acted as if a claim had been asserted. But there are better explanations for these communications than that a claim was made. First, Northern States was doing its best to convince the WDNR to assert a claim against the railroads and to persuade the railroads that the WDNR would do just that. Potential targets of a claim, like Wisconsin Central and Soo Line, would naturally act to avoid and minimize liability. Second, if there was any chance that Northern States's actions might be construed as a "claim," Wisconsin Central needed to protect its future right to indemnification by fulfilling its obligations under the agreement to promptly notify Soo Line.[13] Third, especially as the end of the claim period drew near, Wisconsin Central had incentive to act as if a "claim" had been "asserted" so it could benefit from indemnification by Soo Line, which, recall, bore responsibility until the claim period expired. That prudence dictated Wisconsin Central taking protective measures does not mean that a "claim" was "asserted."

To buttress this argument, Wisconsin Central draws our attention to the meeting between the railroads' attorneys

---

W.D. Wis. Case No. 12-cv-00602 D.E. 1, Supp. App'x 152–54. But all claims against the railroads in that suit were dismissed upon their settlement with the EPA. Inclusion of those causes of action in the complaint in the 2012 case does not prove that Northern States had a right to prevail on them.

[13] The Agreement requires timely notice for indemnification. Agreement § 18(b), Supp. App'x 21. A party looking to maintain the contract's protection thus has every reason to notify so that if a claim is made and succeeds there is no doubt that notification was made and indemnification not waived.

where both parties agreed to take a cooperative stance toward Northern States and the WDNR but against affirmatively seeking a PRP letter. Because the railroads jointly agreed not to seek a PRP letter (which would have been the assertion of a "claim"), Wisconsin Central argues it is unfair for Soo Line to say it is entitled to indemnification because no claim was timely asserted. Wisconsin Central's attorney recounts in her affidavit that "because [she] understood that both Parties were operating under the belief that the allegations regarding Kreher Park constituted a 'claim' for which [Wisconsin Central] would be seeking indemnification from Soo Line … [she] felt that any strategy regarding Kreher Park to protect [Wisconsin Central's] interests came with the concomitant duty to protect Soo Line's interests, too, as the future indemnitor … ."[14]

But whether Wisconsin Central believed that Soo Line intended to indemnify is not relevant, because under the Agreement, neither party should have tried to incur liability for the purpose of securing indemnification. Under Minnesota law, every contract has an implied covenant of good faith and fair dealing. *In re Wren*, 699 N.W.2d 758, 765 n.10 (Minn. 2005). For Wisconsin Central to seek a PRP letter—that is, to seek to have a claim asserted against it just to secure indemnification from Soo Line—risks breaching that covenant. Likewise, it would have been a breach of the covenant for Soo Line to try to delay the issuance of such a letter until after the claim period just to secure indemnification from Wisconsin Central. Neither party alleges that anything like that happened here.

---

[14] Supp. App'x 130.

3.

One might think that Wisconsin Central is left paying for these environmental clean-up costs at the Ashland site due to an unfortunate technicality. But recall the purpose of the in-demnification provision at issue here: to assure Wisconsin Central's lenders so that they would agree to finance the asset purchase. The initial version of the contract had provided that Wisconsin Central would immediately assume liability for all environmental matters "relating to the ownership of the As-sets or the operation of LST *arising out of the acts of omissions of parties other than Soo.*" (emphasis supplied). After the execu-tion of this initial version, Wisconsin Central's lenders threatened to withdraw their financing of the deal because unexpected environmental claims might have prevented Wis-consin Central from being able to repay the loans. To allow the agreement to go forward, Wisconsin Central and Soo Line renegotiated the terms of indemnification, replacing the fault-based allocation of liability in the initial agreement with a time-based allocation: for environmental claims asserted within ten years of the Agreement, Soo Line would retain lia-bility, but after that time period, Wisconsin Central would as-sume all liability, even for environmental claims arising out of Soo Line's own fault.

This arrangement served its purpose. Had any environ-mental claims been asserted during the ten-year claim period, Soo Line's duty to indemnify would have protected Wiscon-sin Central's lenders from having their interests subordinated to the environmental claims. Wisconsin Central enjoyed the benefit of its bargain—the financing of its purchase of Soo Line's assets and security from environmental claims for ten years. But it came with a price—the assumption of liability for

all further environmental claims relating to its purchase, even those that are the fault of Soo Line and its predecessors. This Kreher Park environmental contamination matter is such a claim.

"Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." RESTATEMENT (SECOND) OF CONTRACTS § 202(1) (1981). The district court's interpretation of the Agreement is in accord with the purpose of the renegotiated indemnification clause.

*        *        *

For these reasons, we agree with the district court's conclusion that no "claim" concerning the Kreher Park environmental contamination site was asserted against the railroads during the Agreement's claim period. During that period, Northern States neither threatened litigation nor invoked its right to sue the railroads, and the WDNR did not take any action that imposed any legal duties or impending legal peril on either railroad. Under the Agreement, the responsibility to defend and indemnify against the environmental claims thus belonged to Wisconsin Central, not to Soo Line.

**B.**

Next we consider the question of allocation of damages. Wisconsin Central argues that even if a "claim" was not "asserted" until after the claim period, it can be liable under the indemnification clause for only a portion of the parties' settlement with the EPA and Northern States.

We again start with the text of the Agreement's indemnification clause. Its relevant portion states "[Wisconsin Central] shall assume … liabilities and obligations of Soo [Line]: …

[for] all claims for environmental matters relating to the ownership of the Assets or the operation of LST …"[15]

The Agreement defines "Assets" with a seven-page list that includes, among other things, all interests in the physical railroad lines, improvements to them, the land on which they are located, and attached facilities; maintenance and communication equipment; parts inventory; trademarks; personnel files, accounting records, customer and supplier lists, and other business records; and rights related to the Assets under other contracts. The Agreement defines "LST" as "the lines of railroad described in Exhibit A," which is a detailed description of the paths of the lines.

The "claim[s] for environmental matters" at issue here are the EPA's naming of the railroads as PRPs and Northern States's subsequent CERCLA contribution action against them. In a letter to the railroads, the EPA identified two activities for which it had "credible evidence that the railroads contributed to or affected contamination at the Site." One of these was the dredging of Chequamegon Bay near the commercial dock around the year 1900, which the EPA says exacerbated pollution by disturbing contaminants from sediments. The other was the dumping of waste from railroad equipment. Against an original site cost estimate of approximately $100 million, the EPA and Northern States demanded from the railroads a "very fair" $12.9 million, close to the $10.5 million figure eventually paid to settle their claims. Neither railroad contests that the final settlement was motivated at least in part by the allegations included in the EPA's letter.

---

[15] Agreement (as amended) § 4(a)(v)(3), Supp. App'x 34.

Wisconsin Central argues that Soo Line cannot show that these claims "relat[ed] to" the "ownership of the Assets" or "the operation of LST." For Wisconsin Central, the settlement of the Superfund matters involved a wide range of activities, only some of which concerned the assets or operations it acquired. So Wisconsin Central contends that Soo Line has not met its burden to show that the damages award reasonably approximates its losses. As an example, the dredging of the area around the commercial dock is cited as not properly within the scope of the indemnification clause. Soo Line and its predecessors built the commercial dock, operated it to further their railroad business, and owned it until 1982 (when Soo Line deeded it to a local college). Wisconsin Central claims that it cannot be held responsible under the Agreement for the dredging of the dock because it purchased neither the dock nor its operations.

To be entitled to complete indemnification, Soo Line needs to establish that the liability is for a "claim" related to either (1) "the operation of LST"—*i.e.*, the operation of those rail lines that Wisconsin Central purchased, or (2) "the ownership of the Assets" purchased by Wisconsin Central.

1.

Wisconsin Central contends that it cannot be liable for the dredging under the first part—"operation of LST"—for two reasons. First, interpreting "operation of LST" narrowly as the operation of the rail lines themselves, Wisconsin Central essentially argues that the dredging of the commercial dock was not part of the operation of the physical rail lines it purchased. To Wisconsin Central, the dock was a separate operation altogether serving other tenants, including a coal company and a paper company, and used mostly as a public

dock after 1909. Second, Wisconsin Central interprets "operation of LST" as limited to the "modern-day" rail line operations that it acquired, not the historical operation of those lines. Wisconsin Central contends it cannot be liable for the dredging of the dock because that activity was not part of the rail line's "modern-day" operations.

The Agreement's text does not support these interpretations. The Agreement refers to the "the operation of LST" in the singular, not "operations," plural. And the Agreement does not state that the "operation of LST" extended only to recent operations or those that continued to the time of the sale. Like almost any business operation that continues for over one century, the business of the railroad changed over the years. As part of its purchase, Wisconsin Central agreed to assume liability for "all" environmental claims arising out of the operation of the rail lines it acquired. Without a time limit, "all" extends to however long ago those liabilities arose and regardless of what later became of the relevant aspect of those operations. The only timeline in the clause is about when a "claim" is "asserted," not when the underlying basis for it occurred. If the liability for a claim for an environmental matter relates to the operation of LST and would have been Soo Line's, then it is covered by the provision and is now Wisconsin Central's.

Nor do we construe "relating to … the operation of LST" as referring only to the physical operation of the rail lines within the right-of-way. It is natural and consistent with the Agreement's commercial purpose for the scope of indemnification to extend to liability for activities on land not purchased by Wisconsin Central. Part of the operation of a rail line is the construction and maintenance of the surrounding

infrastructure that makes the rail line accessible and useful for business purposes. Liabilities arising from such activity are liabilities of the railroad business, and when selling various assets of that business, such liabilities need not follow the land on which some wrongful action was taken but might instead follow the assets most central to the business.

Applying this understanding, we conclude that the dredging of the commercial dock was part of the "operation of LST." The dock was built—and at the time of the relevant conduct, owned—by the same company that owned and operated the rail lines. The dock is extremely close geographically to the rail lines. There was no conceivable purpose for the railroad to have built this dock at this location except to allow cargo to be transferred between railcars and ships. That is, the dock was built to further the business of the railroad. Both parties admit that the railroad serviced the commercial dock (in addition to other nearby businesses). As counsel for Wisconsin Central admits, there were rails on the docks.[16] From all of this evidence, we conclude that the dredging of the dock at issue, undertaken around 1900, was part of the operation of the rail lines. That the railroad leased space on the dock to other businesses, and that the dock later came to be used primarily for other purposes, do not preclude the dock from being part of the business of the rail lines at the time of the dredging. Even if the dredging was carried out in part for the benefit of other tenants, it was still maintenance of a dock that was part of the operation of the rail lines.

---

[16] Oral Argument at approximately 4:40.

2.

Even if Wisconsin Central is not liable under the "operation of LST" phrase, Soo Line argues the other railroad is liable for the entire environmental claim under the second part of the indemnification clause—"relating to the ownership of the Assets." Soo Line observes that Wisconsin Central acquired all of Soo Line's existing rail assets in the region, including the right-of-way that passes through the Superfund site. As an owner of that right-of-way, subject to limited defenses, Wisconsin Central could be held strictly liable under CERCLA for the cost of the entire environmental cleanup, under joint and several liability. Soo Line therefore contends that the claims were related to the right-of-way, an "Asset" that Wisconsin Central acquired, so the entirety of Soo Line's settlement payment fits within the scope of that liability.

Soo Line's argument strikes us as correct insofar as the railroads incurred costs purely because of strict liability for land ownership on the site. But the liability and related damages in the Superfund matters were not limited to ownership of the land. Rather, the record shows that the settlement amount here was based on the polluting activities allegedly carried out by the railroads. As evidence of this we can look to the EPA settlement letter,[17] which describes those activities.

The EPA has the right to hold landowners on Superfund sites strictly liable for the entire cost of a cleanup through joint and several liability. But it often allows PRPs to settle with the government for amounts far smaller than the total cost of the environmental cleanup, and the allocation of liability can be further refined through private contribution actions under

---

[17] Supp. App'x 155–57.

Section 113 of CERCLA. Both occurred as to this site. Northern States sued the railroads, *Northern States Power Co. v. City of Ashland, Wis.*, 131 F. Supp. 3d 802 (W.D. Wis. 2015), and jointly with the EPA, entered into a settlement with them for less than the full cleanup costs.

When allocating liability under such contribution claims, courts consider equitable factors such as whether a party caused the pollution. *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 934 F.3d 553, 566 (7th Cir. 2019). But because fault is only one factor, even after an allocation, parties can be left financially responsible for more of the cleanup costs than they would bear under a purely fault-based regime. *E.g.*, *id.* at 567 (where liability for 25% of the costs of a cleanup was imposed on a faultless landowner). For the indemnification clause here to serve its purpose, it must extend to such liability. After all, such liability "relate[s] to ownership of the Assets." It was by owning the "Assets" that the parties could become jointly and severally liable for the Superfund site in the first place. Therefore, if the railroads had not been accused of contributing to the pollution but were instead held strictly liable as landholders—other facts being the same—we would still require Wisconsin Central to indemnify Soo Line under the "ownership of the Assets" part of the indemnification clause.

Yet even though the EPA may have had the right to hold the railroads responsible for the entire cleanup cost just for owning land in the Superfund site, the EPA instead secured a settlement amount that was based on the alleged polluting

activities of the railroads.[18] Similarly, Northern States's contribution lawsuit against the railroads was based on the activities carried out by the railroads.[19] The claims were thus related to the operation of the railroad line, more so than the ownership of the Assets. So Soo Line's argument—that Wisconsin Central should bear the entire cost because CERCLA allows for full joint and several liability for anyone holding land in the Superfund site (but not subject to one of the narrow defenses)—does not persuade us.

For the indemnification clause to apply, the environmental claim must relate to the basis of the settlement for which Soo Line seeks indemnification. Here, more than ownership of the assets, that is the operation of the railroad business identified by the EPA as contributing to the contamination on the site.

3.

In a further attempt to bear a smaller allocation of damages, Wisconsin Central points out that Soo Line and its predecessors used to have a much larger footprint in the Kreher Park area. In 1877, Soo Line's predecessors owned over 5 acres of the future Superfund site. In 1908, they owned 4.87 acres. Soo Line sold or deeded away much of this property in the decades and years before the Agreement, and in the 1987 Agreement Wisconsin Central came to own only 2.29 acres. Using their expert's calculation that railroad holdings in the Kreher Park area averaged 4.23 acres between 1874 through 2002, Wisconsin Central contends that the ratio of its acquired

---

[18]  Supp. App'x 155–57.

[19]  Supp. App'x 152–54.

property to this average railroad holding should determine the percentage of the EPA settlement that it is responsible for: 54.1%.

This contention is appealing but in the end unpersuasive. Such a rough allocation might be appropriate when all parties are held responsible based on strict liability for ownership of contaminated land and where no better basis exists for assigning liability. But here, liability was premised on the historical actions of the parties and their predecessors, and the parties memorialized the allocation of that liability between them in a contract. All liability for these claims is related to the operation of LST, so under the Agreement, Wisconsin Central is responsible for 100% of the environmental damages, plus interest, attorneys' fees, and costs.

We offer a final note as to the district court's order resolving the allocation of damages.[20] Both that court and this court treat this later order as an addendum to the earlier grant of summary judgment to Soo Line.[21] Although this later order only briefly addressed the question of damages, to be fair, the district court was not presented with some of the sophisticated arguments we have received in this appeal. We have reviewed de novo the record and the summary judgment motion practice in the district court. We can conclude that the indemnification clause applies to the entire settlement because it was based on the operation of the railroad line. Soo Line has thus met its burden to show that the damages award reasonably approximates its losses. *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 579 (Minn. Ct. App. 2004)

---

[20] Dist. Ct. D.E. 113.

[21] Dist. Ct. D.E. 84.

("[D]amages need not be proved with certainty; it is legally sufficient that a reasonable basis for approximating loss is shown.").

\*          \*          \*

For these reasons, we agree with the district court's holding that Wisconsin Central is responsible for the entirety of the railroads' settlement with the EPA. The indemnification clause extends to "all claims for environmental matters relating to the ownership of the Assets and the operation of LST." The claims which the railroads settled with the EPA and Northern States all arose out of the dumping of waste on the right-of-way, or from the other activities of Soo Line's predecessors in support of the operation of the railroad. The claims are thus related to either the ownership of the railway or the operation of the rail lines and are therefore within the scope of the Agreement's indemnification clause.

## III.

Both parties have offered considered and well-developed arguments in support of their positions. Giving full effect to the railroads' Agreement, including the indemnification clause, results in Wisconsin Central bearing these environmental costs in their entirety. For the reasons relayed above, we AFFIRM the district court's grant of summary judgment to Soo Line.